## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

CAPITAL CITY RESCUE MISSION )
a Domestic Religious Corporation )
)
Plaintiff, )                                    Civil Action No.  1:25-cv-77 (MAD/DJS)
)
v. )
)
CITY OF ALBANY, NEW YORK )
a New York Municipal Corporation )
)
Defendant. )

---

### Verified Complaint

1.     This lawsuit arises from the City of Albany's implementation of land use regulations in a manner that discriminated against and substantially burdened the religious exercise of Capital City Rescue Mission in violation of federal law under the Fair Housing Act, Religious Land Use and Institutionalized Persons Act, and the United States Constitution.

2.     The City of Albany imposed regulations to deny Capital City Rescue Mission rights to religious land use and equal access to housing; therefore, this action seeks equitable relief as well as damages and challenges how the City of Albany has imposed its land use regulations to bar Capital City's proposed Project effectively.

### Jurisdiction & Venue

3.     This Court has original jurisdiction over this case under (i) 42 U.S.C. § 3613(a)(1)(A), as an aggrieved person may commence a civil action in the appropriate United States district court to obtain appropriate relief concerning an alleged discriminatory housing practice or breach of a conciliation agreement; (ii) 28 U.S.C. § 1331, as this action arises under

1

the laws of the United States; and (iii) 42 U.S.C. § 3613(c), as this civil action arises out of occurrence of alleged discriminatory housing practices, and (iv) 42 U.S.C. § 1988, to secure reasonable attorney fees as part of the case.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2), as the City of Albany is situated in this district, and because a substantial part of the events or omissions giving rise to the claims, as well as the real property at issue, are situated in this district.

### Parties and Property at Issue

5.    Plaintiff, Capital City Rescue Mission (hereinafter referred to as "Capital City" or Plaintiff") is a domestic religious corporation in the state of New York.

6.    Over the years, Capital City acquired several properties in the City of Albany including the real property at issue in this litigation is commonly known as 257 and/or 259 South Pearl Street. (hereinafter referred to as "Subject Property").

7.    However, adjacent to or within the Subject Property's immediate proximity are other parcels owned by Capital City including:

    a.   237 South Pearl Street
    b.   245 South Pearl Street
    c.   249 South Pearl Street
    d.   80 Trinity Place
    e.   82 Trinity Place
    f.   84 Trinity Place

8.    The Subject Property is in a Mixed-Use Form-Based South End Zoning District pursuant to City of Albany, N.Y., The Code § 375-202.1 (2024), whose facilities are used as a religious or charitable organization.

9.    Defendant, City of Albany (hereinafter referred to as "the City" or "Defendant"), is a municipal corporation in the County of Albany, State of New York.

**Capital City's Religious Exercise**

10.     Capital City Rescue Mission's sincerely held religious belief that addiction can be overcome through faith alone is based upon the following passages from the Bible:

     a.   **Deuteronomy 10:14-19** Emphasizes that the Israelites should practice extra care for widows, orphans, and foreigners because God does the same.

     b.   **Deuteronomy 10:18**, " He executes justice for the orphan and the widow, and shows His love for the stranger by giving him food and clothing."

     c.   **Zechariah 7:9-10**, "Administer true justice; show mercy and compassion to one another. Do not oppress the widow or the fatherless, the foreigner or the poor. Do not plot evil against each other."

     d.   **James 1:27**, "Religion that God our Father accepts as pure and faultless is this: to look after orphans and widows in their distress and to keep oneself from being polluted by the world."

**Factual Background**

11.     Initially founded in 1835 by a group known as the Albany City Mission, Capital Gospel Mission began in the south end of the City of Albany with the purpose of aiding those in need of food, shelter, and other necessities while also serving as a place of worship for the gospel of Jesus Christ.

12.     Capital City Rescue Mission, a separate entity at the time, began in October 1949 by a group of businessmen at a storefront on 64 Madison Avenue in the City of Albany. Capital City believes it began when God, upon the group of men, provided "soup, soap, and salvation" to

3

the homeless and hungry in downtown Albany.[1] ***Exhibit A,*** *Draft Environmental Impact Statement,* (Appendices excluded), Section 1.0 Executive Summary, pp. 1-1, 1-4.

13.     As such, the founding group began by providing food and necessities to those in need, holding nightly chapel services and meals at the 64 Madison Avenue storefront.

14.     To expand its religious mission, Capital City acquired and moved to 50 Hudson Avenue in the City of Albany, where it first provided overnight shelter to men.

15.     Capital City remained at 50 Hudson Avenue for about forty-five (45) years until it outgrew that location and moved to the Subject Property at 257/259 South Pearl Street.

16.     While not initially affiliated with Gospel Mission, Capital City furthered the same religious mission and charitable services throughout the decades. It continued to do so when it merged with Gospel Mission on or about September 20, 2007.

17.     As a religious institution, Capital City regularly holds gospel services throughout the year at the Subject Property, including numerous spiritual renewal programs, referrals, and counseling services; while continuing to offer overnight shelter, meals, recovery programs, and other charitable services.

18.     As provided in the Albany City Mission's *Seventy-Ninth Annual Report, Albany City Mission, Nineteen Fourteen*:

> "...it is hard to draw the line between the things temporal and the things spiritual. In mission work we transform the things temporal to the things spiritual. Often a meal or a lodging to a hungry, homeless man has been the means of his transformation. The touch of Christ has still its ancient power. The bread of life becomes the bread of heaven, the water of life an everlasting spring. it has been with this knowledge ever before us, we have dispensed our gifts to the widow, orphan, sick, sinful, homeless and unfortunate."

---

[1] Capital City Rescue Mission, **https://capitalcityrescuemission.org/about/history/** (accessed November 3, 2024).

19.     As part of its religious mission, Capital City's work includes services for those suffering from addiction, where it employs staff certified in administering Narcan to individuals suffering from an overdose and has established the following programs: Celebrate Recovery, Residence Recovery Men: *The New Life Program at 259 South Pearl Street. **Ex. A,** p.1-7.*

20.     The mission statement for Capital City Rescue Mission is as follows: "The CCRM [Plaintiff] is dedicated to proclaiming the life-changing gospel of Jesus Christ to the homeless and needy of the Capital Region, providing for the whole person- body, mind, and spirit—to help them return to society, maturing in Christ as productive citizens." ***Ex. A,*** p. 1-4.

21.     As part of Capital City's sincerely held religious beliefs and mission, it is called upon by God to aid people in need which includes those who do not have shelter.

### Prior Land Use Disputes with Defendant

22.     In 1995, Plaintiff Capital City had outgrown its facility at 50 Hudson Avenue, and therefore sought to build a new mission facility for its ministry at property commonly known as 62-75 Green Street.

23.     After a hearing which there was reported significant public opposition to the proposed relocation, on August 31, 1995, the City Planning Board denied Plaintiff's application on the grounds that its proposed mission facility constituted a "rooming house" exclusively, not a "house of worship", under the then City of Albany Code, Ch. 375; therefore, a special permit was required.[2] ***Exhibit B,*** *Appellate Division Opinion & Order,* p. 3.

---

[2] Capital City appealed to the Zoning Board of Appeals, which affirmed the Planning Board's denial, on October 24, 1995. Consequently, Capital City filed suit with the Supreme Court of the State of New York, County of Albany on March 7, 1996. Justice Joseph C. Teresi issued an order affirming the Zoning Board's denial on April 26, 1996. As a result, Capital City filed an appeal with the Appellate Division, Third Department on May 16, 1996.

24.    On appeal, the Appellate Division for the Supreme Court of Albany County agreed

with the petitioner, Capital City, that the Zoning Board's determination must be annulled, asserting:

> "Even if we accepted respondent's [Zoning Board's] conclusion that
> these activities did not fall within the definition of a house of
> worship, we fail to see how they do not comport with the definition
> of a religious or charitable institution.
>
> …respondent's conclusion that petitioner [Capital City] was
> required to obtain a special use permit because the proposed facility
> fits the definition of a rooming house was irrational…"

**Ex. B,** p. 3.

25.    Subsequently, on March 12, 1997, Plaintiff submitted another site plan application

with Defendant concerning the Subject Property located at 257/259 South Pearl Street, to change

the designated use under local Code, from retail appliance store to a charitable or religious

organization. **Exhibit C,** *Albany County Supreme Court, Decision & Order.*

26.    The Albany County Planning Board (different from the City Planning Board) issued

a recommendation for approval regarding the proposed use change; yet, on June 19, 1997, the City

Planning Board subsequently denied such proposal based on the alleged undesirable character of

the use contemplated and proximity to an elementary school. **Ex. C.**

27.    Capital City filed suit again on June 19, 1997, in Albany County Supreme Court,

and on September 16, 1997, the court annulled the Planning Board's denial of Capital City's use

change proposal, finding the Board's determination was "not based on any evidence of potential

hazards". **Ex. C,** p. 4.

28.    However, in its opinion, the court also indicated that the Planning Board's analysis

over concerns with a nearby elementary school should have occurred during a review under the

State Environmental Quality Review Act ("SEQRA"); however, when determining whether

Capital City's project had a sufficient impact to trigger the threshold requirement for an

environmental impact statement, the Board issued a "negative declaration" finding "no significant impact." *See, **Ex. C,*** p. 5.

29.     Following the court's decision, the City Planning Board ultimately approved the Subject Property's use change from retail appliance store to a charitable or religious organization, allowing Capital City to acquire the Property on December 8, 1998.

### Proposed Project at Issue

30.     Since December 8, 1998, Capital City has utilized the Subject Property as a religious and charitable institution, providing religious services and counseling, recovery programs, transitional housing, and overnight shelter.

31.     On or about March 23, 2021, Capital City applied with the City for approval to renovate and construct a four-story addition at the Subject Property, as it had outgrown its existing facilities during the last twenty-three (23) years it had owned the Property and needed to expand its accommodations for individuals. ***Exhibit D,*** *Master Plan Application.*

32.     Specifically, Plaintiff's proposal seeks to consolidate the Subject Property with its adjacent parcels 245 & 249 South Pearl Street, and 78, 80, 82, & 84 Trinity Place into a single parcel, demolish a one-story brick building at No. 80 Trinity Place, and construct an addition by approximately 32,000 square feet (hereinafter referred to as the "Project"). ***Ex. D.***

33.     With its current facilities, Capital City presently provides sleeping accommodations for two-hundred and forty-six (246) individuals, around one hundred of those individuals have been using sleeping mats on the floor. ***Ex. A,*** p. 1-19.

34.     With this addition, Capital City planned to provide 246 beds as well as other accommodations such as storage lockers, laundry, a counseling office, classrooms for education and group recovery classes, and a section for transitional housing to allow those who find

employment to have a more suitable place to live while seeking independence within the community. *Ex. A,* pp. 2-1 – 2-4.

35.     According to Albany Code, Ch. 42, Pt. 13, § 42-182, the Planning Board is authorized to approve, approve with conditions, or deny various land use and zoning applications and development plans.

36.     From March 23, 2021, through June 2021, Capital City complied with and submitted to the City Planning Board numerous applications, reports, and documents including master plan application, conditional use permit, site plans, architectural drawings, development review application, demolition review application, lot consolidation application, and its full environmental assessment form.

37.     On May 15, 2021, Hershberg & Hershberg Consulting Engineers and Land Surveyors ("Hershberg & Hershberg") prepared a Parking Demand Study, which concluded that the available parking spaces for the Property "are adequate to meet the projected parking demand." *Exhibit E, Parking Demand Study,* p. 5.

38.     On June 4th and 8th, 2021, Hershberg & Hershberg also issued a Sewer Engineer's Report, Water Engineer's Report, and its Storm Water Pollution Prevention Plan & Storm Water Management Report for Capital City, in which all reports concluded such project will not adversely affect adjacent or downstream properties, nor any sewage systems. *Exhibit F, Sewer Engineer's Report,* p. 7, *Exhibit G, Water Engineer's Report,* p. 10 & *Storm Water Report,* (Appendices excluded), p. 18.

39.     On August 3, 2021, the Defendant's Division of Engineering completed its development review of Plaintiff's proposed Project, finding it approved of said Project provided

some comments and corrections to the architectural drawings. **Exhibit H,** *City Division of Engineering Review.*

40.     The following year on June 7, 2022, the City Planning Board issued a SEQRA Resolution classifying Capital City's proposed Project as a "Type I" action pursuant to SEQRA, 6 NYCCR § 617.4, subjecting it to determination of environmental significance by the Planning Board, as the intended lead agency. **Exhibit I,** *June 2022 SEQRA Resolution.*

41.     Pursuant to SEQRA, actions classified as Type I carry with them the presumption that they are likely to have a significant adverse impact on the environment and may require an environmental impact statement ("EIS"), and a determination of significance must be made by comparing the impacts which may be reasonably expected to result from the proposed action. 6 NYCRR § 617.4(a)(1).

42.     Moreover, the Planning Board formally assigned itself as "SEQRA Lead Agency" for the alleged environmental review of Capital City's Project. [3] **Ex. I.**

43.     Soon after, on or about August 9, 2022, the City Planning Board issued a Positive Declaration pursuant to SEQRA and determined that Capital City's proposed Project would have a significant effect on the environment, therefore, a Draft Environmental Impact Statement ("DEIS") was required, and must be prepared for public review.   **Exhibit J,** *Planning Board Positive Declaration.*

44.     According to the Positive Declaration, the basis for finding a potential significant adverse environmental impact pursuant to criteria set forth under § 617.7(c)(1) of SEQRA was the

---

[3] SEQRA defines "lead agency" as "an involved agency principally responsible for undertaking, funding, or approving an action, and therefore responsible for determining whether an environmental impact statement is required in connection with the action…" 6 NYCRR § 617.2(v).

impact on historic and archeological resources, and "[i]nconsistency with the existing community/neighborhood character." ***Ex. J.***

45.    Following the Board's determination, on November 8, 2022, Weston Davey, Historic Site Restoration Coordinator with the New York State Parks, Recreation & Historic Preservation, issued a letter to Capital City stating, "based on our review of the building elevations dated 6/09/2022, *it is the opinion of the SHPO that the proposed project will have No Adverse impact to historic resources*." (Emphasis added). ***Exhibit K,*** *NYSPR & HP Nov. 8, 2022, Letter.*

46.    Moreover, months prior to the Planning Board's Positive Declaration, Capital City had submitted to the City a Phase I Archaeological Survey by Stony Creek Archaeology, Inc., (issued on January 19, 2022), for the Project, finding *no archaeological sites* were identified at the Subject Property and "*no additional archaeological investigation* is warranted for the project area." (Emphasis added). *See,* ***Exhibit L,*** *Phase I Archaeological Survey,* p. 35.

47.    By the beginning of 2023, Capital City's proposed Project had drawn the attention of many residents within the community, including Albany County Legislator, 6th District, Hon. Sam Fein, who submitted a letter on behalf of numerous residents including multiple community leaders, expressing their objections to Capital City expanding their facility for housing homeless individuals. ***Exhibit M,*** *January 23, 2023, Opposition Letter.*

48.    Among those who signed Legislator Fein's letter were Albany Common Councilmember, 1st Ward Albany Chief City Auditor, Hon. Dorcey Applyrs; Albany Common Councilmember, 1st Ward, Hon. Sonia Frederick; Chief Executive Officer of Trinity Alliance of the Capital Region, Inc., Harris Oberlander; LCSW-R, and Executive Director of Youth FX, Bhawin Suchak. *See,* ***Ex. M.***

49.    On February 14, 2023, the City Planning Board issued a SEQRA Resolution, adopting a final scope for Capital City's draft Environmental Impact Statement ("DEIS"), which required Capital City's DEIS to address the following environmental impacts of sanitary sewer, historic, cultural, and archaeological resources, aesthetic and visual resources, land use and zoning, community and neighborhood character, and emergency services/community services. ***Exhibit N,** Planning Board Final Scoping Document.*

50.    Pursuant to SEQRA, 6 NYCCR § 617.8(a), scoping is purposed for focusing in on potentially significant adverse impacts and "to eliminate consideration of those impacts that are irrelevant or not significant."

51.    Thus, despite submissions of Capital City's Phase I Archaeological Survey, Sewer Engineer's Report, the November 8, 2022, letter from Weston Davey Historic Site Restoration Coordinator and other documentation addressing most if not all of Defendant's concerns, the final scope nonetheless cited to these concerns as alleged environmental impacts. *See, **Ex.'s F, G, K, L, & N.***

52.    Capital City subsequently prepared and submitted a four hundred and twenty-two (420)-page draft EIS on October 11, 2023, to the Planning Board, in compliance with its final scoping, that included numerous appendices of resubmitted documents such as Full Environmental Assessment Forms Part 1, 2, and 3, Sewer Engineer's Report, Weston Davey's letter regarding historic preservation/restoration, and Phase I Archeological Survey. *See generally, **Ex. A.***

53.    On November 14, 2023, the Planning Board determined that Plaintiff's submitted DEIS was "incomplete and inadequate" to commence with public review and attached an exhaustive list of alleged "deficiencies" for Capital City to resolve before progressing any further in its site plan approval process. ***Exhibit O,** November 14, 2023, Planning Board Decision.*

54.     As provided in the SEQRA Handbook, Chapter D, "Review of the Draft EIS", "[t]he regulations do not demand that the draft EIS be perfect—that would be an unreasonable expectation." N.Y. State Dep't of Envtl. Conservation, The SEQRA Handbook, Ch. D, § 1, p. 127 (4th ed. 2020).

55.     The Handbook further states "The lead agency should ensure that all relevant information has been presented and analyzed but should neither expect nor require a 'perfect' or exhaustive document.  The degree of detail should reflect the complexity of the action and the magnitude and importance of *likely* impacts." *Id.* at Ch. D, § 2, p. 128.

56.     The purported "deficiencies" listed by Defendant were overly broad, exceeding beyond what pretext is required for a DEIS, and range from complaints about the format of Capital City's DEIS document to insufficient or missing details that were irrelevant to the alleged adverse impacts and/or provided for in the appendices. *See,* ***Ex. O,*** *"List of Deficiencies".*

57.     Nevertheless, in another attempt to work with the Planning Board, Capital City prepared and submitted an Amendment I to its DEIS on or about February 28, 2024; where it specifically addressed each deficiency alleged by the Planning Board.  *See,* ***Exhibit P,*** *DEIS Amendment I.*

58.     However, on May 7, 2024, months after submission of Amendment I, the Planning Board rejected Capital City's DEIS again, inclusive of Amendment I, based on the same allegations of being incomplete and inadequate, whereby it re-adopted and re-incorporated the same list of alleged deficiencies first issued on November 14, 2023. ***Exhibit Q,*** *May 7, 2024, Planning Board Decision.*

59.    The Planning Board in issuing its decision in May 2024, did not make any modifications to its purported deficiency list despite Capital City submitting an Amendment I and addressing in detail each listed concern. *See, **Ex. Q,*** (May 7, 2024) *"List of Deficiencies"*.

60.    Pursuant to SEQRA on the preparation and content of environmental impact statements, "EISs must be analytical and not encyclopedic", and "EISs should address only those potential significant adverse environmental impacts that can be reasonably anticipated and that has been identified in the scoping process." 6 NYCRR § 617.9(b)(1)-(2).

61.    The "potential significant adverse environmental impacts" declared by Defendant, i.e., archaeological and historic resources, and consistency with community character, were conclusively addressed by Capital City's extensive submissions of documentation to the Planning Board, to which those concerns could no longer be "reasonably anticipated." *Id.*

62.    Issuing identical denials to Capital City Rescue Mission's DEIS and Amendment I with no modifications to its alleged list of deficiencies demonstrates hostile and bad faith conduct by the City during the site plan approval process.

63.    By imposing regulations for environmental review under SEQRA and issuing repeated denials to Plaintiff's DEIS, the Planning Board has effectively denied Plaintiff any ability to progress forward with site plan approval, thereby denying its proposed Project for its religious land use without having to render an actual "final decision".

64.    As a result, Capital City is left in a state of perpetual limbo through which any further engagement with the City at this stage is futile.

65.    Defendant's conduct has subjected Capital City Rescue Mission to considerable delay, effort, and expense from its good faith attempts to comply with and work with the Planning Board.

## COUNT I

### Violation of the Right to Free Exercise of Religion Guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. § 1983

66.     Plaintiff, Capital City Rescue Mission incorporates by reference the allegations in paragraphs 1 through 65.

67.     The Free Exercise Clause of the First Amendment to the United States Constitution provides "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. CONST. amend. I.

68.     The Free Exercise Clause is applicable to the States under the terms of the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940).

69.     A government restriction that is not neutral but is meant to infringe upon or restrict practices because of their religious motivation is subject to strict scrutiny. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 546 (1993).

70.     Creating a formal mechanism for granting exceptions renders a policy not generally applicable, regardless of whether any exceptions have been given, because its "invites" the government to decide which reasons for not complying with the policy are worthy of solicitude. *Fulton v. City of Philadelphia*, 593 U.S. 522, 536–538 (2021).

71.     Government regulation is subject to strict scrutiny whenever it treats any comparable secular activity more favorably than religious exercise.

72.     To survive strict scrutiny the law must advance interests of the highest order and be narrowly tailored in pursuit of those interests. *Lukumi,* 508 U.S. at 546.

73.     The City of Albany Code inherently creates a mechanism for granting exceptions through conditional use approval, use designation approval and appeal, and zoning change applications.

14

74.    Here, the City's interpretation and application of the City of Albany Code substantially burdens Capital City Rescue Mission's sincerely held religious belief that addiction can be cured through biblically based treatment.

    a.  First, the City's interpretation and application of the City of Albany Code discriminates against Capital City Rescue Mission, and other faith-based rehabilitation centers, by essentially forcing it either compromise its sincerely held religious beliefs or not be able to use its property for religious exercise..

    b.  Second, the City of Albany's Code discriminates against Capital City Rescue Mission's religious exercise by treating comparable secular uses more favorably. When judged against the asserted government interest that justifies the regulation at issue, a religious rehabilitation center poses no greater harm to the statute's purpose of "provid[ing] for retail, personal and business services, offices, and financial services in locations with convenient access to the region's population consistent with comprehensive planning policies" than a secular rehabilitation center.

75.    Thus, the application of the ordinance unquestionably treats secular drug and alcohol rehabilitation more favorably than religious exercise by putting for-profit, non-religious organizations on unequal footing with Plaintiff and other religious organizations like it.

76.    The City's actions taken under the City of Albany Code do not advance interests of the highest order.

77.    The City's actions taken under the City of Albany Code  are not the least restrictive means of advancing an interest of the highest order.

78.    The City's actions are not rationally related to any legitimate governmental interest.

79.     As a direct result of the City's violations of the U.S. Constitution, as alleged above, Capital City Rescue Mission is entitled to equitable relief, declaratory relief, damages, costs, and fees.

80.     Capital City Rescue Mission is suffering irreparable harm for which there is no adequate remedy at law, and Capital City Rescue Mission is entitled to injunctive relief and to recover compensatory and nominal damages, costs, and attorney's fees.

## COUNT II

### The City of Albany has Engaged in a Practice or Custom of Violating the Constitutional Rights of Capital City Rescue Mission through Punitive Application of its Zoning Code

81.     Plaintiff Capital City Rescue Mission incorporates by reference the allegations in paragraphs 1 through 80.

82.     The City's Planning Board appointed itself as the sole lead agency for purposes of reviewing Capital City's Project under SEQRA.

83.     Moreover, the City by way of its Planning Board, is the governmental body authorized to approve, deny, and/or condition land use/zoning applications, which includes determining whether an application will require an EIS review.  Albany Code, Ch. 42, Pt. 13 § 42-182.

84.     Therefore, the City through the Planning Board acted as the final decisionmaker with the final decision-making authority concerning the Plaintiff's site plan applications for the Subject Property and the denial of Plaintiff's rights under the First Amendment as outlined in Count I of this Complaint.

85.     Plaintiff, Capital City Rescue Mission, has demonstrated through the facts set forth above that it was harmed caused by a violation of its rights under the First Amendment Free

Exercise Clause through the denial to operate a faith-based rehabilitation and shelter facility under Defendant's processes for Capital City's DEIS application.

86.    The "practice" or "custom" which caused Capital City Rescue Mission's injury arose out of the following:

   a.   The denial of a building permit in 1995 to allow for the construction of a shelter and rehabilitation facility on the Property, and subsequent affirmation of such denial by the Albany Zoning Board of Appeals.

   b.   The denial of an application for use change in 1997 to change the designated use from retail appliance store to a charitable or religious organization.

   c.   The Positive Declaration issued by the Planning Board, determining the Project would have a significant effect on the environment.

   d.   The rejection of Capital City's DEIS premised on the Planning Board's "*List of Deficiencies*".

   e.   The second rejection of Capital City's DEIS following submission of an Amendment I, premised on the identical unmodified "*List of Deficiencies*".

   f.   The City withdrew Capital City Rescue Mission 's application without ruling on the Congregate Care.

87.    The City of Albany has engaged in a practice or custom of violating the constitutional rights of Capital City Rescue Mission, Inc. through its punitive application of its zoning code and SEQRA.

88.    The City is the moving force behind the constitutional rights violation suffered by Capital City, as outlined above in paragraphs 82 through 84.

89.    The City's practice and custom demonstrated a deliberate indifference to the risk that a constitutional right violation would occur to Capital City.

90.    As a result of the violation of the constitutional rights of Capital City Rescue Mission, the City is liable to it pursuant to *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978).

91.    Capital City Rescue Mission is suffering irreparable harm for which there is no adequate remedy at law, and is entitled to injunctive relief and to recover compensatory and nominal damages, costs, and attorney's fees.

## COUNT III

### Violation of the Fair Housing Act, 42 U.S.C. § 3604

92.    Plaintiff Capital City Rescue Mission incorporates by reference the allegations in paragraphs 1 through 91.

93.    The Fair Housing Act ("FHA") provides it is unlawful:

> To . . . make unavailable or deny a dwelling to any person because of race, color, religion, sex familial status or national origin. (b) To discriminate against any person . . . in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin. 42 U.S.C. § 3604(a)–(b).

94.    Included in the definition of discrimination is "a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

95.    The statute also prohibits discrimination against individuals with handicaps, defined as "(1) a physical or mental impairment which substantially limits one or more of such

person's major life activities, (2) a record of having such an impairment, (3) or being regarded as having such an impairment." 42 U.S.C. § 3602(h), 42 U.S.C. § 3604.

96.     This includes individuals addicted to alcohol and/or drugs and facilities offering treatment to these individuals. *Oxford House, Inc. v. Browning*, 266 F. Supp. 3d 896, 910–911 (M.D. La. 2017).

97.     The actions taken by the City of Albany violate the Fair Housing Act ("FHA") in that:

      a.  Capital City Rescue Mission, a religious entity, is a protected class under the FHA, 42 U.S.C. § 3604.

      b.  Capital City Rescue Mission provides housing and treatment to individuals recovering from drug and/or alcohol addiction, both the facility and the individuals being protected under the FHA, 42 U.S.C. § 3602(h).

      c.  The City's restrictions on Capital City Rescue Mission's use of the Property are based upon religion and status, violating the FHA, 42 U.S.C. § 3604.

      d.  The City has refused to make reasonable accommodations in rules, policies, practices, or services when such accommodation is necessary to afford the residents of Capital City Rescue Mission the equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B).

      e.  The City does not have a compelling state interest in precluding Capital City Rescue Mission's use of the Property.

98.     To establish a violation of the FHA, a plaintiff need not show a discriminatory intent but need only prove that the challenged practice has a discriminatory effect. *Davis v. New York City Housing Authority,* 278 F.3d 64 (2d Cir. 2002).

99.      As a religious institution, Capital City is a protected class under the FHA, 42 U.S.C. § 3604.

100.    Capital City provides housing, transitional housing, and recovery programs at the Subject Property for individuals who are homeless, and/or recovering from addiction, therefore, classifying such individuals as protected as well under the FHA 42 U.S.C. § 3604.

101.    The City has implemented restrictions to Capital City's use of the Subject Property premised on religion and handicap status, in violation of the FHA.

102.    Under the FHA's definition of discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

103.    Capital City is uniquely impacted by the City's denials as a religious organization compared to other related organizations under the local jurisdiction.

104.    As a direct result of the City's discriminatory conduct Capital City has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law and is entitled to injunctive relief as well as recover compensatory and nominal damages, costs and attorney fees.

105.    Capital City therefore respectfully requests the relief identified below.

## COUNT IV

### Violation of the Religious Land Use and Institutionalized Persons Act
### Substantial Burden Provision 42 U.S.C. § 2000cc(a)(1)

106.    Plaintiff Capital City incorporates the allegations in paragraphs 1 through 106 by reference.

107.    Congress directed that the Religious Land Use and Institutionalized Persons Act 42 U.S.C. § 2000cc *et seq.,* ("RLUIPA") should be "construed in favor of a broad protection of

religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. 2000cc-3(g).

108.    Congress defined "religious exercise" to broadly include, "[a]ny exercise of religion, whether or not compelled by, or central to, a system of religious belief," and specifies that the "use, building, or conversion of real property for the purpose of religious exercise shall be considered for the religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7).

109.    Congress provided in § 2000cc(a)(1) of RLUIPA statutory protections for "religious exercise" as follows: "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution . . . is in furtherance of a compelling government interest [and] is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc(a)(1).

110.    As explained above, a fundamental aspect of Capital City's sincere religious beliefs is aiding those in need by providing shelter as well as a sanctuary for worship and gathering so that its gospel teachings can be spread, and needs can be met.

111.    As Capital City's operations grew in the 1990's, it found a location whose facilities were sufficient to accommodate its existing and anticipated members and tenants; now as a couple decades have subsided and their operations have continued to grow, Capital City seeks to renovate and expand its existing facilities to further its religious mission.

112.    Since March 2021, Capital City has attempted to work with municipal staff and board members in good faith, by complying with various requests for additional documentation on

its proposed project, attending numerous sessions or meetings with the City Planning Board, and completing multiple reports and studies about the Subject Property's proposed construction.

113.    Following the Planning Board's implementation of a Draft Environmental Impact Statement under SEQRA, Capital City complied with all statutory and local requirements regarding the preparation of a DEIS, and addressed the various concerns alleged by the Board throughout this process.

114.    By implementing SEQRA to review Capital City's proposed project, Defendant made an "individualized assessment" of Capital City's religious land use within the meaning of 42 U.S.C. § 2000cc(a)(2)(C).

115.    The Planning Board issued a Positive Declaration subjecting Capital City to an intensive EIS review process, despite receiving expert reports and studies, site plans, and drawings establishing there was no reasonable anticipation for a significant adverse environmental impact to archaeological and historical resources, as well as consistency with community character.

116.    The Planning Board ultimately denied Capital City's DEIS by disregarding well-documented findings and reports from state government staff and outside professional experts.

117.    The Planning Board's rejections of Capital City's DEIS including its Amendment I, were based on alleged "deficiencies" unsupported by the evidence in the public record and are arbitrary and capricious in nature.

118.    As a result of the Planning Board's denials, Capital City has not been able to renovate and expand the Subject Property thereby fulfilling its sincerely held religious beliefs in helping those in need, resulting in a burden on the organization that is significant and exceeds well beyond a simple inconvenience.

119.    Notwithstanding, the Planning Board's repeated denials of the DEIS and its Amendment I were not conducted in the least restrictive means of achieving any compelling interest that could be asserted by the City.

120.    The City's unsupported concerns about impacts to archaeological and historical resources are definitively resolved by expert findings and thus not compelling.  Where the City alleges Capital City's Project may adversely impact community character, also lack in evidence and clarity, thus are not compelling.

121.    Under the totality of the circumstances, the City has imposed a substantial burden on Capital City's religious exercise.

122.    The City's actions in implementing its land use regulations have directly caused considerable delay, uncertainty, and expense to Capital City.

123.    As a direct result of the City's discriminatory conduct Capital City has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law and is entitled to injunctive relief as well as recover compensatory and nominal damages, costs and attorney fees. Therefore, Capital City respectfully requests the relief identified below.

**COUNT V**

**Violation of the Religious Land Use and Institutionalized Persons Act
Nondiscrimination Provision 42 U.S.C. § 2000cc(b)(2)**

124.    Plaintiff Capital City incorporates the allegations in paragraphs 1 through 124 by reference.

125.    Under RLUIPA's nondiscrimination provision, it establishes "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(1).

126.    RLUIPA protects against, *inter alia,* "subtle forms of discrimination when, as in the case of the grant or denial of zoning variances, a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards," *Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 900 (7th Cir. 2005).

127.    For nondiscrimination claims, evidence of discriminatory behavior is assessed through various factors including: "the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decision-making process departed from established norms, statements made by the decision-making body and community members, reports issued by the decision-making body, whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available." *Chabad Lubavitch v. Litchfield Historic Dist.,* 768 F.3d 183, 199 (2d Cir. 2014).

128.    The series of events dating back decades ago when Capital City first decided to relocate to the Subject Property, reveal reoccurring hostile behavior by the City Planning Board against Capital City as a religious institution.

129.    Since 1998, as part of its religious mission, Capital City had openly and consistently used the Property in part to provide overnight sleeping accommodations for individuals, recovery programs, transitional housing, and other charitable services; and the Project at issue proposes nothing new in constructing an addition.

130.    Despite Defendant possessing ample evidence confirming the Project would continue to be consistent with community character and have no impact on archaeological or historic resources, it proceeded to subject Capital City to a comprehensive and expensive EIS process.

131. The City's subsequent denials of Capital City's DEIS lacked merit, were overly broad, and arbitrary in nature.

132. The City has imposed land use regulations and acted against Capital City on the basis of religious discrimination fomented by the opposition detailed above.

133. As a direct result of the City's violations under 42 U.S.C. § 2000cc(b), as alleged above, Capital City is suffering irreparable harm for which there is no adequate remedy at law.

134. Furthermore, as a direct result of the City's violations of 42 U.S.C. § 2000cc(b), Capital City is entitled to recover compensatory and nominal damages, costs and attorney fees. Capital City therefore respectfully requests the relief identified below.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, Capital City Rescue Mission, respectfully requests a judgment against Defendant, City of Albany, and that this Honorable Court:

a. Adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declaration shall have the force and effect of final judgment and that the Court retains jurisdiction of this matter for the purpose of enforcing the Court's Order.

b. Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare the decision by the City to issue a Positive Declaration under SEQRA and subsequently deny Capital City's DEIS and Amendment I, as violations of the Free Exercise Clause, the Religious Land Use and Institutionalized Persons Act, and the Fair Housing Act, and further declare that Capital City may proceed with its Project as proposed and direct the City of Albany to issue all necessary approvals and permits.

c. Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 64, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc preliminarily and permanently enjoin the City from enforcing its land use regulations to prevent Capital City from completing its Project.

d. Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 42 U.S.C. § 2000cc-4, adjudge and award Capital City compensatory and nominal damages.

e. Pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000cc-4(d), Fed. R. Civ. P. 54(d) and other applicable law, award Plaintiff its reasonable attorney's fees and costs; and

f. Grant such other and further relief as the Court deems equitable, just and proper.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Capital City Rescue Mission hereby demands a trial jury in the action of all issues so triable.

## VERIFICATION

According to 28 U.S.C. § 1746, I, _____ Perry Jones ___, as Capital City Rescue Mission's Executive Director and Pastor, hereby declare under penalty of perjury that the factual allegations contained in the Complaint are true and correct and that I have personal knowledge of the same and can attest to the same at trial. Executed this _16th_ day of January 2025.

Dated: _Jan. 16_, 2025          By: /s/ _Perry Jones, CEO, Pastor_

26

Respectfully submitted,

**Philip J. Vecchio, P.C.**

By: _____
Philip J. Vecchio, Esq.
Attorney for Plaintiff
24 Huntswood Lane
East Greenbush, N.Y. 12061
PVecchio@nycap.rr.com
Telephone (518) 857-2897
Facsimile (518) 479-4335
Federal Bar No. 505274